**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**TERRENCE M. BOOTH,**

    **Petitioner,**

        **v.**                                **Civil Action No. 3:22cv426**

**DAVID ANDERSON,**

    **Respondent.**

**<u>MEMORANDUM OPINION</u>**

Terrence M. Booth, a Virginia state prisoner proceeding *pro se* and *in forma pauperis*, brings this petition pursuant to 28 U.S.C. § 2254 ("§ 2254 Petition," ECF No. 1) challenging his conviction in the Circuit Court of the City of Norfolk, Virginia ("Circuit Court"). In his § 2254 Petition, Booth claims that he is entitled to relief based upon the following grounds:

Claim One:   "The Petitioner received ineffective assistance of counsel where Mr. Connell failed to impeach witnesses with available exculpatory evidence and evidence inculpating other perpetrators." (ECF No. 1-1, at 4.)[1]

Claim Two:   "Mr. Connell provided ineffective assistance where he failed to move to make a motion to strike the sufficiency of the evidence." (ECF No. 1-1, at 7.)

Claim Three: "The Petitioner was denied the effective assistance of counsel under the Sixth Amendment to the United States Constitution when Mr. Connell failed to file Petitioner's motion to suppress Mr. Smith's identification." (ECF No. 1-1, at 11.)

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system to the parties' submissions. The Court corrects the spacing and punctuation in the quotations from Booth's submissions. The Court generally omits any secondary citations in the quotations from Booth's submissions.

Respondent moves to dismiss, *inter alia*, on the ground that Booth's claims are procedurally defaulted and lack merit.  Booth has responded.  (ECF No. 17.)  For the reasons stated below, the Motion to Dismiss (ECF No. 12) will be GRANTED and the action will be DISMISSED.

## I.  Procedural History

### A.  Pre-Trial

Booth was initially indicted for malicious wounding, use of a firearm in the commission of a felony, subsequent offense, aggravated malicious wounding, attempted first-degree murder, maliciously discharging a firearm within an occupied dwelling, and possession of a firearm by a violent felon.[2]  (*See* ECF No. 14, at 2.)  Booth was later indicted for a second count of use of a firearm in the commission of a felony, subsequent offense.  (*See* ECF No. 14, at 2.)  Before trial, the Circuit Court granted the Commonwealth's request to *nolle prosequi* the malicious wounding count.  (*See* ECF No. 14, at 2.); Circuit Court Record 94.[3]  Although Booth was appointed counsel, and he confirmed his intention to continue with this appointment, Booth continuously filed *pro se* motions and variety of other submissions that were improper because he was represented.  *See* CCR 94.  On May 6, 2019, the Circuit Court granted appointed counsel's motion to withdraw and appointed Christian Connell, Esq. as stand-by counsel.  CCR at 155.  On June 3, 2019, Booth was arraigned, and trial was set for August 21, 2019.  CCR at 190–91.  Booth continued to flood the Circuit Court with various *pro se* motions.

---

[2] As noted by Respondent, the Circuit Court granted a motion to sever the possession of a firearm by a violent felon count, and Booth "has never challenged this conviction."  (ECF No. 14, at 2 n.2.)

[3] The Circuit Court employed a continuous pagination for the lengthy criminal record. For cites to hearing transcripts and for cites to the Circuit Court record that were not docketed in this Court, the Court utilizes the pagination assigned by the Circuit Court and refers to the cites as "Circuit Court Record" or CCR.

On July 29, 2019, the Circuit Court held a preliminary hearing for numerous motions Booth filed *pro se*.  CCR at 1169.  Booth expressly indicated that he did not want Mr. Connell to represent him for his motions, as discussed later in Part III.D.2.  CCR at 1170.  At the end of the hearing, and at Booth's request, the Circuit Court appointed Mr. Connell to represent Booth at trial.  CCR at 1193.  Thus, Mr. Connell had only been Booth's appointed counsel for less than one month when trial started on August 21, 2019.

On August 22, 2019, a jury found Booth guilty of aggravated malicious wounding, attempted first-degree murder, maliciously discharging a firearm into an occupied building, and use of a firearm in the commission of a felony, subsequent offense.  (*See* ECF No. 14-1, at 1, 4.)  The Circuit Court granted the Commonwealth's motion to *nolle prosequi* the first count of use of a firearm in the commission of a felony.  (*See* ECF No. 14, at 2.)  The Circuit Court sentenced Booth to a total sentence of twenty-nine years which was the sentence recommended by the jury.  (ECF No. 14-1, at 5; *see* ECF No. 14, at 2.)  Booth appealed.  On September 10, 2020, the Court of Appeals of Virginia denied the petition for appeal.  (ECF No. 14-6, at 1.)  The Court of Appeals of Virginia explained as follows:

> A jury found appellant guilty of attempted first-degree murder, aggravated malicious wounding, use of a firearm in the commission of a felony, subsequent offense, and maliciously discharging a firearm into an occupied building.  On appeal, he argues that the evidence was insufficient to prove that he committed the offenses because "the witness identifications were inherently incredible and contrary to human experience."  Appellant failed to present this argument to the trial court, but he asks the Court to consider it under the ends of justice exception to Rule 5A:18,
>
> "No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice."  Rule 5A:18.  "'The ends of justice exception is narrow and is to be used sparingly,' and applies only in the extraordinary situation where a miscarriage of justice has occurred."  *Wandemberg v. Commonwealth*, 70 Va. App. 124, 137 (2019) (quoting *Holt v. Commonwealth*, 66 Va. App. 199, 209 (2016) (*en banc*)).  "[T]o show that a miscarriage of justice has occurred, thereby invoking the ends of

justice exception, the appellant must demonstrate that he or she was convicted for conduct that was not a criminal offense *or the record must affirmatively prove that an element of the offense did not occur*." *Id.* (emphasis added) (quoting *Holt*, 66 Va. App. at 210).

"In order to avail oneself of the exception, [appellant] must affirmatively show that a miscarriage of justice has occurred, not that a miscarriage *might* have occurred." *Melick v. Commonwealth*, 69 Va. App. 122, 146 (2018) (quoting *Redman v. Commonwealth*, 25 Va. App. 215, 221 (1997)). "Therefore, in examining a case for miscarriage of justice, we do not simply review the sufficiency of the evidence under the usual standard, but instead determine whether the record contains affirmative evidence of innocence or lack of a criminal offense." *Wandemberg*, 70 Va. App. at 137 (quoting *Holt*, 66 Va. App. at 210).

"At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013) (quoting *Blevins v. Commonwealth*, 40 Va. App. 412, 423 (2003)).

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)). In doing so, we discard any of appellant's conflicting evidence, and regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence. *Id.* at 473.

Cleion Smith was good friends with appellant. Appellant was like a brother to Smith, and they had known each other for over thirty years. Appellant was in a romantic relationship with Smith's stepdaughter, Marquita White, who lived at Smith's residence.

On April 28, 2018, Smith had a cookout at his house. Smith and appellant drank alcohol at the cookout, and they had no arguments. Smith testified that at the end of the cookout, about 10:00 p.m. or 11:00 p.m., he was "still functional, but [he] was feeling pretty good," and appellant was "pretty incoherent." Appellant was assisted upstairs to a bedroom.

White testified that Smith and appellant "went everywhere together" and were close friends. She stated that appellant was intoxicated at the cookout, and he accused White of having a sexual relationship with Smith because they "were too close." White testified that appellant appeared to be angry. Appellant fell asleep on a "double chair," and White saw a black handgun "between the cushion and the chair." White took the gun and put it behind a basket in a closet. She then helped appellant upstairs and put him in a bed.

White testified that Smith was also intoxicated at the cookout and that he fell asleep under a table located on the first floor. Smith eventually went to bed upstairs, but fell out of the bed. Twice, White went into Smith's bedroom to help him. Appellant told White that Smith "just wanted to look up [her] skirt." White stated that this was the first time that appellant had accused her of having a sexual relationship with Smith.

At about 1:00 a.m. or 2:00 a.m., Christopher Carter, Smith's cousin called Smith and asked him to come to his apartment to "sit with him" because he was feeling sad about his sister's recent death.  Carter lived close to Smith.  Smith went to Carter's apartment and took a small bottle of gin with him.  They drank gin and beer, but Smith stated that Carter did not appear to be intoxicated.

Sometime after midnight, appellant asked White where Smith was. Appellant spoke to Smith on the phone, and he hurriedly got dressed and left the house.  White testified that appellant had an "[a]ngry face" when he got ready to leave the house.  At about 6:00 a.m. or 7:00 a.m., White discovered that the gun was no longer in the closet where she had placed it.

Smith testified that while he was at Carter's apartment, appellant called him and asked him where he was.  Smith asked appellant to come to Carter's apartment, which he did.  Smith stated that appellant did not act unusual at the apartment, that he got a phone call, and that he asked Smith to drive him somewhere.  Appellant then left on foot to purchase cigarettes, leaving Smith and Carter at Carter's apartment.

About twenty minutes later, appellant returned to Carter's apartment. Carter let appellant into the apartment, then went into his bedroom.  Smith testified that when appellant returned to the apartment, he appeared to be "a little hyper." Appellant paced back and forth, and Smith asked him what was wrong.  Appellant responded, "Everything is fucked up now."  Smith asked him, "Like what," and appellant replied, "Like this," and pulled a black gun out of his waistband.  Smith was sitting on the couch, and appellant shot the gun, shooting Smith in the right side of his chest.  Smith asked appellant, "Man, what's up?"  Appellant responded, "Shut the fuck up," and shot Smith in the collarbone while Smith was still seated on the couch.  Smith charged appellant, and they "tussled" with the gun.  The gun fired again and shot Smith in the arm.  The two men continued to struggle over the gun, appellant could not get the gun to fire, and he left the apartment.  Smith testified that Carter was not in the room when appellant shot him.

Smith admitted that he had used cocaine about three or four days before the incident, but stated that he was not under the influence of cocaine on the evening of the shooting.  Smith testified that neither he nor Carter had guns on the night of the shooting.  At trial, when asked if he had any doubt that appellant shot him, Smith replied, "He shot me.  He tried to take my life."

Carter testified that Smith was not intoxicated when he came over to visit him on the night of the shooting.  He stated that when appellant came to the apartment, appellant and Smith argued.  Carter stated that, at one point, appellant pulled up his shirt and removed a gun from his back area.  Carter then went into his bedroom.  He locked the bedroom door, "jumped on the floor and buried" himself. Carter claimed that he did not hear any gunshots.  He heard Smith call him, and he went back into the living room where he saw Smith had been shot.  Appellant was gone.  Carter testified that he was intoxicated that night.  Carter explained that he did not tell the 911 operator or the police that appellant shot Smith because he was drunk and did not want to say anything.  He also stated that he did not have a strong recollection of what he told detectives.

Before Smith was transported to the hospital, Norfolk Police Officer James Elder responded to the crime scene, and Smith told him, "[Appellant] shot me. I'm going to fucking kill him. [Appellant] is the one who shot me." Elder testified that Smith "continued to make that statement" "over and over." Elder found a bullet hole in the couch. He also found shell casings and an unspent bullet. Norfolk Police Officer Gran Beaman was also at the crime scene, and he testified that Smith said appellant had shot him.

At the hospital, while Smith was still in the trauma section of the emergency department, he told Virginia Beach Police Detective Alex Benshoff that appellant had shot him. Benshoff stated that Smith was clear and concise with his identification of appellant and had no hesitation. Smith also told Benshoff that he had known appellant for over thirty years, since they were children. Benshoff showed Smith a photograph of appellant, and Smith identified appellant as his shooter from the photograph.

This record clearly does not contain affirmative evidence of appellant's innocence or a lack of a criminal offense. *See Wandemberg*, 70 Va. App. at 137. The evidence presented included Smith's positive identification of appellant as the person who shot him. In addition, White testified that appellant was angry with Smith on the night of the shooting. Carter testified that appellant and Smith argued before the shooting and that appellant pulled up his shirt and removed a gun while they were in Carter's living room. When Carter next returned to the living room, Smith had been shot and appellant was gone. The evidence not only failed to demonstrate a miscarriage of justice, but was sufficient to allow a reasonable factfinder to conclude beyond a reasonable doubt that appellant was the person who shot Smith. *See e.g.*, *Melick*, 69 Va. App. at 146. Accordingly, Rule 5A:18's ends of justice exception does not apply.

(ECF No. 14-6, at 1–5 (alterations in original).) On June 25, 2021, the Supreme Court of Virginia refused Booth's petition for appeal. (ECF No. 14-11, at 1.)

### B. Habeas Proceedings

On February 11, 2020, while Booth's appeal was pending in the Court of Appeals of Virginia, Booth filed a petition for writ of habeas corpus in the Circuit Court. (ECF No. 14-7, at 1.) In his habeas petition, Booth raised the following claims, as summarized by the Circuit Court:

(1) The Commonwealth had promised to turn over exculpatory evidence but failed to explain that the evidence was inadmissible;

(2)  On October, 22, 2018, the Commonwealth used perjured testimony when she said Booth claimed the malicious wounding charge was forged when he actually asserted the use of the firearm charge was forged;

(3)  The trial court violated his due process rights when it failed to consider Booth's reply when the court denied Booth's motion to set aside the verdict;

(4a)  A sheriff's officer committed forgery when he forged a police officer's signature on the use of a firearm in the commission of a felony warrant.

(4b) The Commonwealth motioned to *nolle prosequi* the use of a firearm indictment and direct indicted the aggravated malicious wounding indictment as "an unjustifiable pretext;"

(4c)  The trial court abused its discretion in permitting the Commonwealth to "upgrade . . . indictments."

(ECF No. 14-8, at 4.)  The Circuit Court found that Booth's claims were "not cognizable in

habeas corpus" because they were "either barred by *Slayton v. Parrigan*, 215 Va. 27, 30, 205

S.E.2d 680, 682 (1974), because these claims could have been raised at trial or on direct appeal

and were not or by *Henry v. Warden*, 265 Va. 246, 248–49 (2003), because these claims were

raised and decided."  (ECF No. 14-8, at 4–5 (citations omitted).)

On June 14, 2021, while his direct appeal was still pending before the Supreme Court of

Virginia, Booth filed a second petition for a writ of habeas corpus in the Supreme Court of

Virginia.  (ECF No. 14-10, at 1.)  In his second habeas petition, Booth raised the following

claims:

Claim 1(a):  "Ineffective assistance of counsel" because trial counsel failed "to retrieve the physical (exculpatory evidence) from his cell phone." (ECF No. 14-10, at 10.)

Claim 1(b):  Trial counsel "failed to argue petitioner's motion to suppress Smith's suggestive identification and request the Holley-Telfaire instructions." (ECF No. 14-10, at 11.)

Claim 1(c):  Trial counsel "failed to ask the Court for funds to locate (2) two critical defense witnesses." (ECF No. 14-10, at 12.)

| Claim 1(d): | Trial counsel "failed to make a motion to strike the sufficiency of the evidence." (ECF No. 14-10, at 12–13.) |
|---|---|
| Claim 2: | "Miscarriage of justice . . . this Court should entertain petitioner's habeas corpus because he is innocent." (ECF No. 14-10, at 13.) |
| Claim 3: | "Miscarriage of justice due to prosecutorial misconduct." (ECF No. 14-10, at 13.) |

On May 16, 2022, the Supreme Court of Virginia determined that Booth's claims were "barred by Code § 8.01–654(B)(2) and *Dorsey v. Angelone*, 261 Va. 601, 604 (2001)" because "the facts of which were known prior to petitioner's first petition for a writ of habeas corpus, were not previously raised." (ECF No. 14-12, at 1.)

On June 8, 2022, Booth filed his current § 2254 Petition.

## II.  Exhaustion and Procedural Default

Before a state prisoner can bring a § 2254 petition in federal district court, the prisoner must first have "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). "A distinct but related limit on the scope of federal habeas review is the doctrine of procedural default." *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998). This doctrine provides that "[i]f a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim." *Id.* (citing *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991)). Absent a showing of "cause for the default and actual prejudice as a result of the alleged violation of federal law," or a showing that "failure to consider the claims will result in a fundamental miscarriage of justice," this Court cannot review the merits of a defaulted claim. *Coleman*, 501 U.S. at 750.

8

Respondent argues that all of Booth's claims are barred from review here because they were not properly raised in the state courts and the Supreme Court of Virginia found it barred by Va. Code Ann. § 8.01–654(B)(2) (West 2023).  Section § 8.01–654(B)(2) of the Virginia Code constitutes an adequate and independent state procedural rule.  *See Clagett v. Angelone*, 209 F.3d 370, 379 (4th Cir. 2000) (citing Va. Code Ann. § 8.01-654(B)(2) for the proposition that "claims not raised in an initial state habeas petition cannot generally be raised in subsequent state habeas petitions").  Booth's claims are clearly defaulted.  Nevertheless, Respondent acknowledges that under *Martinez v. Ryan*, 566 U.S. 1 (2012), "ineffective assistance of counsel, or the lack of counsel, during an initial-review collateral proceeding may constitute justifiable cause for a procedural default in certain circumstances." (ECF No. 14, at 15.)  Additionally, Booth argues that he is actually innocent and trial counsel failed to introduce purportedly exculpatory evidence as he alleged here in Claim One here.  (ECF No. 1-1, at 21–22.)  The Court finds that Booth's claims are procedurally defaulted, and that Booth has shown neither cause and prejudice,[4] nor that he is actually innocent.  Nevertheless, in the interest of judicial economy and because Booth's claims clearly lack merit, the Court instead turns to the merits of Claims One, Two, and Three.

---

[4] Booth's theory of cause for his default is convoluted: he faults the Circuit Court, the prosecutor, and his trial counsel.  (*See* ECF No. 1-1, at 29–31.)  Booth contends that during his sentencing, these three "led Petitioner to believe that his motion (IAC) was an 'appeal' issue and not a collateral attack issue." (ECF No. 1-1, at 29.)  The Court fails to discern how this could excuse Booth's default.  Even if Booth misunderstood or was misled during his sentencing into thinking he should raise ineffective assistance of counsel on appeal, Booth did not raise these claims in any appeal.  Rather, he raised them for the first time in an original petition for habeas corpus petition in the Supreme Court of Virginia, not in an appeal.  The Supreme Court of Virginia found his claims of ineffective assistance of counsel barred because he could have raised, but failed to raise, these claims in his first habeas petition.  (ECF No. 14-12, at 1.)  Thus, Booth fails to show cause for the default of his claims.  In addition, as discussed below in conjunction with each claim, Booth fails to demonstrate any resulting prejudice from counsel's purported errors.

### III. Ineffective Assistance of Counsel

**A. Applicable Law**

To demonstrate ineffective assistance of counsel, a convicted defendant must show, first, that counsel's representation was deficient and, second, that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the deficient performance prong of *Strickland*, the convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689). The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In analyzing ineffective assistance of counsel claims, it is not necessary to determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice. *Id.* at 697.

As a preliminary matter, Booth's claims of ineffective assistance of counsel are rambling and have continued to evolve.[5] At times, it is unclear what exactly Booth wanted counsel to

_____

[5] As discussed below, Claim Three in particular, appears to have expanded from what Booth argued in his motion to suppress pre-trial. In Petitioner's response, he raises additional questions and theories about his innocence that are difficult to follow. However, any new claims or allegations brought for the first time in a reply are not properly before the Court. "[I]t is axiomatic that [a petition] may not be amended by the briefs in opposition to a motion to dismiss. To hold otherwise would mean that a party could unilaterally amend a [petition] at will, even without filing an amendment, and simply by raising a point in a brief." *Morgan Distrib. Co. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989) (internal citations omitted); *see Snyder v. United States*, 263 F. App'x 778, 779–80 (11th Cir. 2008) (refusing to consider petitioner's statement in a reply brief as an attempt to amend his § 2255 motion to add a new claim); *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, Inc., 847 F. Supp. 2d 843, 851 n.9 (E.D. Va. 2012); *Equity in Athletics. Inc. v. Dep't of Educ.*, 504 F. Supp. 2d 88, 111 (W.D. Va. 2007) (citations omitted) (explaining that "new legal theories must be added by way of amended pleadings, not by arguments asserted in legal briefs"). Therefore, to the extent that Booth seeks to add any new

argue.  From the record, the Court discerns that Booth was not an easy client to represent.  Booth clearly had many thoughts about how his defense should be handled, which likely differed from counsel's chosen strategy.  However, simply because Booth was dissatisfied with counsel's performance because he was ultimately convicted, and because Booth, who is not attorney, believed that counsel should have handled a matter differently, does not show that counsel's performance was deficient.  As discussed below, counsel was neither deficient, nor was Booth prejudiced.

### B.  Claim One

In Claim One, Booth contends: "The Petitioner received ineffective assistance of counsel where Mr. Connell failed to impeach witnesses with available exculpatory evidence and evidence inculpating other perpetrators."  (ECF No. 1-1, at 4.)  Booth argues that several text messages retrieved from his phone showed there was "evidence inculpating other suspects."  (ECF No. 1-1, at 5.)  The messages that Booth references are between himself, and his girlfriend, Marquita White.  In one, Ms. White states:  "He's sticking to. . . I blacked out and don't remember nothing that happened didn't even see a face."  (ECF No. 17-2, at 3.)  Booth also cites to a message that says, "Maybe one day we'll figure it out," and "'when we see him it's a wrap' but they were standing under the tree in my yard."  (ECF No. 17-2, at 3.)  Booth claims that the "he" is Mr. Smith, the victim, and "they" are the other unidentified suspects.  (ECF No. 1-1, at 5.)  In another message, Ms. White states:  "It's gotta be a way to clear your name . . . like fr I don't like it . . . we can prove you weren't there right? . . .  He's slandering your name that's why."  (ECF No. 17-2, at 5.)  Booth faults counsel for not introducing these messages at trial. Booth contends:

_____

claims or theories in his Traverse, the new claims and theories will receive no further consideration in this action.

Sixteen months later, Ms. White testified that the Petitioner shot Mr. Smith over an affair. (An indication that the prosecutor coached her to give it). Furthermore Det. Benshoff testified that Ms. White never told police that she had information related to the shooting of Mr. Smith. The Petitioner furnished Mr. Connell with mitigating evidence which showed that the other culprits had fired shots into the side of Ms. White's house and Mr. Connell failed to investigate it.

> At the outset of Ms. White's cross-examination, Mr. Connell failed to protest the prosecutor's objection, that the text messages were "outside the scope of my examination." Mr. Connell stated, "That's all I have. I may need to recall her." This did not happen and there were no attempts to cross-examine Ms. White on any of the specific text messages or mitigating evidence the Petitioner said existed.

(ECF No. 1-1, at 6 (citations omitted) (paragraph numbers omitted).) Booth argues that these text messages could have been "used to impeach Ms. White and Mr. Smith." (ECF No. 1-1, at 7.) Booth fails to demonstrate, and the Court fails to discern, any deficiency of counsel or resulting prejudice.

### 1. **Counsel Strategically Decided Not to Introduce These Messages**

Mr. Connell explained his decisions about the text messages between Ms. White and Booth as follows:

> I do not recall how or when I received the actual cell phone with these text messages. I do recall, however, that the cell phone had no charging cable and had no power. It wasn't an iPhone or a Samsung phone and I had no idea where to buy a cable. Consequently, Mr. Booth is correct that I never accessed the cellphone.

> However, in a letter I received on June 26, 2019, Mr. Booth provided me with a handwritten version of what he said were the relevant text messages from the cell phone.

> Between then and trial, I explained to Mr. Booth that the messages were of limited to no value.

> One message involved a text to Ms. Marquita White to Booth, in which she wrote that "He's sticking to I blacked out and don't remember nothing that happened didn't even see a face." The "he" was referring to the victim in the case, Cleion Smith. I explained to Mr. Booth that the statement was of limited value. First, it was hearsay and I had no legal basis to introduce it as an exhibit.

> Second, and more importantly, in the police officer's body worn camera footage, one can see Mr. Smith, who had been shot multiple times, lying on the floor. When the police ask the other witness if he knows who shot Mr. Smith, Smith actually screams out that Mr. Booth shot him. It's clear from the body worn camera footage that Mr. Smith had not blacked out as he appears to be awake in the video

and speaks to the officers.  For these reasons, I concluded that it was useless to attempt to impeach Mr. Smith with this text, assuming it was even legally permissible.  Mr. Smith's scream was clearly audible on the police's body worn camera footage.

Moreover, Mr. Smith testified at the preliminary hearing specifically that he didn't tell anybody that he had blacked out and not seen his assailant's face.

Finally, at trial, I was not able to use it to impeach Ms. White, because it was not something she testified contrary to at trial.

The body of the other text messages he wanted me to use was equally useless from a trial standpoint.  The exchange between Ms. White and Mr. Booth was as follows:

White:          There's got to be a way to clear your name.  I don't like it.
Booth:          Why am I not arrested?
White:          He's slandering your name that's why.
Booth:          From day one.

Again, the texts were hearsay and I had no legal basis to offer them in evidence.  I could not use them to impeach Cleion Smith as they were not his statements.  The only bias they showed was that Ms. White was biased in favor of Mr. Booth.  Again, I thought they texts were of limited value.

I can't recall specifically the substance of the other text Mr. Booth thought was helpful, but again I didn't see any way to use it at trial.

Finally, Mr. Booth–although telling me that Ms. White was his girlfriend– left out practically everything else when it came to what happened on the night/morning of the incident.  The first time I learned of what Ms. Marquita White testified to at trial was when she testified at trial.

(ECF No. 14-13, at 2–4 (citations omitted) (paragraph numbers omitted).)

As a preliminary matter, the Court fails to understand why counsel could not have obtained an appropriate phone charger to retrieve the text messages with minimal effort. Nevertheless, with that aside, Booth fails to show that counsel was deficient.  Counsel averred that he knew the content of the text messages that Booth wanted him to introduce at trial, because Booth provided him with what they said, and he intentionally did not introduce them as an exhibit to cross-examine Mr. Smith or Ms. White.  Counsel reasonably determined that these messages which were between Booth and his girlfriend, were inadmissible hearsay, and otherwise were of limited to no value, despite Booth's characterization of the messages.

Booth fails to demonstrate how any of these messages would have been admissible, or how, in light of the compelling evidence of his guilt, they would have been mitigating evidence, much less, exculpatory evidence, that Booth was not the shooter.  The Court turns to each message below.

### 2.  **Message Containing Mr. Smith's Purported Statement to Ms. White**

The first message, according to Booth, was Ms. White telling Booth that Mr. Smith, the victim, was "sticking to. . . I blacked out and don't remember nothing that happened didn't even see a face."  (ECF No. 17-2, at 3.)  This message is clearly hearsay, and it is doubtfully an actual statement that Mr. Smith made to Ms. White.  Moreover, it is unclear what exactly the statement means.  To the extent that Booth argues that this statement means that Mr. Smith did not see who shot him, this is very clearly contradicted by the evidence at trial.  As counsel explained, Mr. Smith clearly, adamantly, and repeatedly identified Booth as the shooter to police right after he was shot and again at the hospital.  *See, e.g.*, CCR 1604, 1607, 1614, 1618, 1644, 1666.  Booth and Mr. Smith had been best friends for thirty years.  CCR at 1557, 1666.  Booth fails to offer any reason why Mr. Smith would insist more than once to different officers that his best friend had shot him unless it was true.  In sum, even if this text message was admissible at trial, it fails to show that Booth was not the person who shot Mr. Smith.  Counsel reasonably concluded that this message, even if somehow admissible,[6] would have little to no impact when compared with

---

[6] Booth insists that this, and other text messages could be admitted under an exception to the "Best Evidence Rule."  (ECF No. 1-1, at 6.)  The best evidence rule in Virginia provides: "To prove the content of a writing, the original is required, except as otherwise provided in these Rules, other Rule of the Supreme Court of Virginia, or in a Virginia statute."  Va. Sup. Ct. R. 2:1002.  The best evidence rule or any exception to that rule has no bearing on the admissibility of the texts between Booth and Ms. White.  Even if counsel introduced the actual phone, which would be the best evidence, the contents of the text that relays what Mr. Smith allegedly said to Ms. White, remains inadmissible hearsay.

the compelling evidence of Booth's guilt.  Accordingly, Booth demonstrates no deficiency of counsel or resulting prejudice with respect to this first text message.

### 3.  <u>Messages About "Other Culprits" and Clearing Booth's Name</u>

The next series of text messages are even less indicative of Booth's purported innocence. Booth first cites to a message that says, "Maybe one day we'll figure it out," and "'when we see him it's a wrap' but they were standing under the tree in my yard."  (ECF No. 17-2, at 3.)  Booth claims that this message shows that there were other unidentified suspects who shot at Ms. White's house.  (ECF No. 1-1, at 6 (citations omitted).)  Later, Booth contends that Ms. White told him that "other culprits were looking for Mr. Smith that same day" and "then fired a weapon to the left side of Ms. White's house."  (ECF No. 1-1, at 27–28.)  However, this message fails to make any sense, is not mitigating, and is certainly not exculpatory.

First, the shooting occurred inside Mr. Carter's apartment a half a block away from the home Ms. White and Mr. Smith shared, CCR 1634–35, not at Ms. White's house, so the reference to "my yard" makes this message confusing at best.  There was also no evidence of a shooting or weapons fired outside or anywhere other than in the living room of Mr. Carter's apartment.  CCR at 1338–39, 1552, 1619.  Moreover, Booth was clearly at Mr. Carter's home when Mr. Smith was shot, and more than one person testified that he had a gun in his possession that night.  Booth also fails to offer any identification of who these "other culprits" might have been or any evidence that this is truly what Ms. White's text message meant beyond his own self-serving statement.  Mr. Smith clearly and unequivocally identified Booth as the shooter to officers immediately after he was shot and again at the hospital.  Counsel reasonably eschewed introducing this text message to try to show that some other unidentified shooters, not Booth, shot Mr. White, and Booth demonstrates no resulting prejudice.

Finally, counsel reasonably decided not to introduce the text message between Booth and Ms. White about finding a way to clear Booth's name.  Counsel concluded this message would show that Ms. White, who was Booth's girlfriend, was merely biased toward Booth.  Naturally, Ms. White would want to believe that Booth was innocent of shooting her stepfather and would hope that he was in another place at the time.  Counsel's determination not to use this text message to impeach Ms. White was imminently reasonable.  In addition, the Court fails to discern, and Booth fails to explain, how the introduction of this message would be exculpatory in any manner.

In sum, because Booth demonstrates neither deficiency of counsel nor resulting prejudice, Claim One lacks merit and will be DISMISSED.[7]

---

[7] The Court believes that much of Booth's argument and his conviction that he was somehow wronged by counsel's performance at trial stems from Booth's appellate counsel, Kristin Paulding's, opinions about these text messages and Mr. Connell's performance.  Ms. Paulding opined:

> Mr. Booth wanted me to confirm that the text messages existed because he did not know why they were not discussed at trial.  I asked Mr. Connell for Mr. Booth's phone and was provided the phone.  The phone was dead when I received it.  When I asked Mr. Connell for the charger he told me he had not received a charger, only the phone.  This phone would not charge on a basic Iphone or Android charger and I had to purchase a charger from Wal Mart.  I was able to do that and charge the phone.  Since the phone was dead when I received it, I do not know if Mr. Connell ever charged it or ever had a charger that was compatible.  Upon turning on the phone, I found the messages that Mr. Booth was referring to. . . . These and additional messages were not brought up during the cross-examination of Mr. Smith or Ms. White.  Mr. Booth did not understand why.  While I cannot comment on Mr. Connell's trial strategy, I am of the opinion that the text messages would have been relevant during cross-examination.  The victim, Mr. Smith, and his cousin, both identified Mr. Booth.  If one of them told Ms. White that he did not see the shooter's face, that would be vastly different than what they testified to at trial.  I explained to Mr. Booth that I believed these text messages were relevant and important to his trial strategy.

(ECF No. 1-2, at 24–25.)  Despite Ms. Paulding's overly critical view of how she would have conducted the trial, counsel provided sound reasons for not introducing these text message at trial.  Simply because a different attorney, looking backwards, claims that she would have conducted the trial in a different manner fails to show that Mr. Connell's performance was deficient.  "There are countless ways to provide effective assistance in any given case," and

### C. **Claim Two**

In Claim Two, Booth contends that, "Mr. Connell provided ineffective assistance where he failed to move to make a motion to strike the sufficiency of the evidence." (ECF No. 1-1, at 7.) Booth's argument appears to be two-fold. First, he contends that the evidence was insufficient to show that he was guilty, and because of this, counsel should have filed a motion to strike. Second, Booth argues that because trial counsel failed to make a motion to strike, any issue surrounding the sufficiency of evidence was not preserved for appeal.

#### 1. **Failure to File a Motion to Strike**

With respect to his first argument, Booth claims that, "the only evidence that ties Petitioner to these offenses is the witness identifications of Mr. Smith and Mr. Carter. Both were extremely intoxicated and high off several mind-altering drugs at the time of the shooting." (ECF No. 1-1, at 9.) Booth suggests that:

> The evidence in this case was insufficient, as a matter of law, to convict [Booth] of the charges. First, there were no cell phone records to place [Booth] at Mr. Carter's apartment at the time of the shooting. Second, no firearm was ever recovered with [Booth]. Third, [Booth] made no statements to suggest he was there or involved in anyway. Fourth, there is not a scintilla of physical evidence connecting [Booth] to Mr. Carter's apartment. Finally, there was no motive. [Booth] and Mr. Smith had been friends for thirty years and had no argument or problems that day.

(ECF No. 1-1, at 10–11.)

Counsel was not deficient for failing to move to strike the evidence on the grounds that Booth advances here. In reaching his conclusion that the evidence was insufficient to convict him, Booth ignores much of the evidence presented at trial.

---

"[e]ven the best criminal defense attorneys would not defend a client the same way." *Strickland v. Washington*, 466 U.S. 668, at 689 (1994) (citations omitted). Contrary to Booth's view, the Court's "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

### a.  **All Three Men Were Intoxicated**

With respect to Booth's preliminary argument that Mr. Smith was drunk and high, it was undisputed that Mr. Smith and Mr. Carter were intoxicated the night of the shooting, and both freely admitted it at trial.  CCR 1369, 1560.  When asked whether he had used drugs that night, Mr. Smith candidly indicated that he did sometimes use cocaine, but he had not that night.  CCR at 1579–80.  Mr. Smith also testified that he also told the hospital about his drug usage because he was afraid of interactions with the many different drugs they gave him in the hospital.  CCR at 1580.  More importantly, Booth ignores the fact that the evidence established that he was also intoxicated.  Ms. White testified that Booth was extremely intoxicated and became angry and accused her of having sexual relations with her stepfather, Mr. Smith.  CCR at 1625–26.  Booth fell asleep on the loveseat downstairs, and he was so intoxicated and incoherent that Ms. White had to help him walk up the stairs to put him to bed around 11:00 p.m.  CCR at 1626–27, 1628–29; *see* CCR at 1560–61.  Booth fails to demonstrate that counsel was deficient for failing to move to strike the evidence simply because Mr. Carter and Mr. Smith were intoxicated.

### b.  **No Physical Linking Booth to the Apartment**

Second, Booth faults counsel for failing to make a motion to strike because no phone records or physical evidence existed linking him to the apartment, and he made no incriminating statements.  However, simply because none of this evidence was collected or existed does not show that Booth is innocent.  Counsel cannot be faulted for failing to move to strike on these grounds as any such motion would have undoubtedly failed.

Detective Benshoff explained that officers did not attempt to collect DNA or fingerprints from the cartridge casing or unspent round because when a gun is fired "it degrades any potential DNA or fingerprints that would then be on the spent shell casing" and that it was uncommon to

find DNA or fingerprints on an unspent round.  CCR at 1651, 1653–55.  In response, to

counsel's questions about why police did not obtain cell phone records to determine Booth's

whereabouts, Detective Benshoff explained that he found no need to collect cell phone records

because he "did not believe that collecting phone[s] would be [of] evidentiary value because we

had a possible suspect identified," CCR at 1657–59, and because he believed Mr. Smith's

"statement as to who shot him."  CCR at 1662–63.  Counsel also asked Detective Benshoff about

why police collected no other evidence like fingerprints and he explained that it was because the

potential suspect had already been identified.  CCR at 1659–60.  Although Booth claims that

there was no evidence proving that he was at Mr. Carter's apartment, that is simply not true as

two people testified that he had been there.

The evidence reflected that when Booth woke-up he asked Ms. White where Mr. Smith

had gone.  CCR AT 1632.  Booth then called Mr. Smith, spoke to him, and shortly thereafter he

left the house.  CCR at 1632.  Ms. White testified that Booth had an "angry face" and was

"rushing" to leave.  CCR at 1633.  Mr. Smith testified that Booth came over to Mr. Carter's

house and Mr. Smith and Booth argued.  CCR at 1563–72.  Mr. Smith further testified that

Booth, after returning from the store, seemed "hyper," made angry comments, and then pulled a

gun and shot Mr. Smith.  CCR at 1563–72.  Mr. Carter testified that Booth came over to his

home and Mr. Smith and Booth argued, and when Booth pulled out his gun, Mr. Carter ran to his

bedroom and locked the door.  CCR at 1365–67.

Counsel argued in closing that the police failed to check phone records, collect DNA or

fingerprints, and that there was no physical evidence linking Booth to the scene.  CCR at 1706–

09.  However, in light of the compelling evidence that Booth shot Mr. Smith, the jury clearly

found the lack of physical evidence was of no import.[8]  Counsel cannot be faulted for failing to make a motion to strike based on a lack of physical evidence.

### c.  **The Evidence Showed Only Booth Had a Firearm**

With respect to the firearm, Booth was the only person who was observed with a firearm on the night of the shooting.  Ms. White testified that she saw the gun in the loveseat where Booth had fallen asleep and she hid it, but that Booth was within eyesight of where she hid it.  CCR at 1626–28.  Ms. White testified that when she checked for the gun at 6:00 a.m. she discovered that Booth had taken it from where she had hidden it earlier that night.  CCR at 1633–34.  Both Mr. Carter and Mr. Smith testified that Booth was armed with a gun at Mr. Carter's house, and Mr. Smith testified that they were not.  CCR at 1367, 1567–71, 1581.  The fact that police did not find Booth with a gun does not somehow exculpate him from being the shooter.  Booth was not arrested until several days after the shooting and clearly had time to dispose of the gun.  CCR at 1665.  Accordingly, counsel cannot be faulted for failing to move to strike the evidence based upon the lack of a recovered firearm, nor was Booth prejudiced.

### d.  **Booth's and Mr. Smith's Friendship**

Lastly, Booth cites the fact that he and Mr. Smith were best friends and argues that because of their friendship there was no reason for Booth to shoot Mr. Smith.  (ECF 1-1, at 10.)  However, the evidence showed that Booth was drunk and angry, and made several comments reflecting that he perceived that Mr. Smith, his best friend, was having sexual relations with

---

[8] Booth chose not to testify in his own defense, and he fails to offer any evidence of where he was at the time of the shooting if he was not at Mr. Carter's apartment.  At the beginning of trial, Booth, under oath, told the Court that he had "given [his] attorney any names of witnesses[,]" and that they were present at the trial.  CCR 1217.  However, Booth does not identify any witnesses that were present the day of trial and were not called as witnesses.  The only witness who testified for the defense was an emergency room resident who treated Mr. Smith that described the alcohol and drug levels tests conducted of Mr. Smith.  CCR at 1436–52.  Booth clearly did not, and does not, have a viable alibi.

Booth's girlfriend, providing a clear motive for Booth to shoot Mr. Smith.  CCR at 1625–26.

Moreover, the fact that Booth and Mr. Smith were best friends also makes it less plausible that

Mr. Smith would lie about Booth shooting him.

In sum, counsel reasonably eschewed advancing the arguments that Booth makes here in

a motion to strike.  In addition, Booth fails to demonstrate any resulting prejudice because the

evidence was clearly sufficient to convict him of shooting Mr. Smith.

## 2.  Failure to Preserve Sufficiency of Evidence Argument for Appeal

Booth's second argument in Claim Two, is that, because trial counsel failed to make a

motion to strike, any issue surrounding the sufficiency of evidence was not preserved for appeal.

Booth contends that "Mr. Connell's failure to make a motion to strike the sufficiency of the

evidence destroyed the petitioner's chance to appeal issues at trial."  (ECF No. 1–1, at 11.)

Booth further argues that, "Mr. Connell's errors caused [Booth's] procedural default."  (ECF No.

1–1, at 11.) [9]  As discussed above, counsel was not deficient for failing to make a motion to

---

[9] Once again, Booth claims that his argument that trial counsel was deficient is bolstered
by his appellate counsel's statements.  In a letter to Booth, Ms. Paulding specifically told Booth
that he should raise this claim that counsel was ineffective for failing to make a motion to strike.
(ECF No. 1-2, at 48–49.)  Ms. Paulding stated in her affidavit:

> My appellate practice has taught me that you must preserve your issues at trial in
> order to have any chance at a successful appeal.  When I received Mr. Booth's
> transcripts, I looked to the motion to strike to determine what specific issues were
> preserved for appeal.  At the conclusion of the Commonwealth's evidence, on
> August 22, 2019, defense counsel did not make a motion to strike.  The parties then
> made arguments about the jury instruction that were going to be presented to the
> jury.  After lunch, defense counsel questioned Mr. Booth about his decision not to
> testify.  The Court then read the jury instructions to the jury and closing arguments
> began.  Defense counsel did not make a motion to strike after the defense rested or
> prior to the closing arguments.  As appellate counsel I knew immediately that the
> issues regarding the sufficiency of the evidence and any other arguments made
> during the closing arguments, would not be considered preserved for appellate
> purposes.

(ECF No. 1-2, at 23.)

strike based on the sufficiency of the evidence arguments that Booth advances here and Booth was not prejudiced.  Thus, Booth fails to show that, even if, trial counsel had preserved the sufficiency of the evidence for appeal, that the Court of Appeals of Virginia would have reached a different result. [10]  Because Booth demonstrates neither deficiency of counsel nor resulting prejudice, Claim Two will be DISMISSED.

**D.  Claim Three**

**1.  Booth's Allegations in his § 2254 Petition For Claim Three**

In Claim Three, Booth contends that:  "The Petitioner was denied the effective assistance of counsel under the Sixth Amendment to the United States Constitution when Mr. Connell failed to file Petitioner's motion to suppress Mr. Smith's identification."  (ECF No. 1-1, at 11.) Booth argues that he, proceeding *pro se*, "filed a pre-trial motion to suppress Mr. Smith's identification due to the detective's suggestive procedure and the physical evidence that was furnished to Mr. Connell by [Booth]."  (ECF No. 1-1, at 12.)  Booth contends that Mr. Smith was intoxicated, and the officer showed him a single photograph of Booth in a "jail-striped uniform." (ECF No. 1-1, at 12.)  Booth then argues that the Commonwealth's Attorney should not have asked Mr. Smith if the person who shot him was in the courtroom during trial without an array of other individuals for him to pick from.  (ECF No. 1-1, at 13.)  Then, although not included in the statement of his claim (*see* ECF No. 1-1, at 11), Booth claims that Mr. Carter's identification of Booth in the courtroom, "(16) months after he gave Det. Benshoff a 'vague' description of the suspect" was also somehow suggestive.  (ECF No. 1-1, at 12–13.)  Booth then cites lengthy legal

---

[10] Indeed, the Court of Appeals of Virginia concluded that "the evidence not only failed to demonstrate a miscarriage of justice, but was sufficient to allow a reasonable factfinder to conclude beyond a reasonable doubt that appellant was the person who shot Smith."  (ECF No. 14-6, at 5 (citation omitted).)

jurisprudence for overly suggestive photo lineups and misidentifications (ECF No. 1-1, at 13–20), which has little to no bearing here because Mr. Smith knew Booth prior to the shooting, and Mr. Carter never identified Booth as the shooter before trial.  Finally, Booth contends "that it was incumbent on Mr. Connell to file the petitioner's motion to suppress Mr. Smith's identification, and but for Mr. Connell's errors, there would have been a reasonable probability of a different result."  (ECF No. 1-1, 19–20.)

### 2.  Booth's *Pro Se* Suppression Motion

Booth argues that he "filed a pre-trial motion to suppress Mr. Smith's identification due to the detective's suggestive procedure and the physical evidence that was furnished to Mr. Connell by [Booth]," (ECF No. 1-1, at 12), and he faults counsel for not advancing his motion.

Prior to trial, Booth filed many motions *pro se* that the Circuit Court allowed Booth to argue one at a time.  Although a motion to appoint Mr. Connell as counsel had been filed, Booth indicated at a pre-trial motions hearing that he wanted "to retract that motion in order to continue filing my motions *pro se*."  CCR at 1170.  In response, Mr. Connell explained to the Court that: "[W]e're in a little bit of a quandary.  He would like to argue his motions . . . .  I have an ethical obligation if I think a motion is frivolous, I'm not permitted to file it or argue it, so he understands that if I'm his counsel I wouldn't argue the motions, but if he is on his own counsel, he can argue the motions, so he would like to argue the motions."  CCR at 1170.  Relevant here, Booth filed a motion to suppress the victim, Mr. Smith's, identification, on the Friday before the Monday hearing.  CCR at 311, 1181, 1184.  However, Booth did not argue this motion at the hearing despite being asked more than once if the Court was missing any motions that he filed.  CCR at 1189, 1191.  Instead, at the very end of the hearing, and after the Circuit Court had already appointed Mr. Connell as counsel, the Commonwealth pointed out that Booth had just

filed a motion to suppress Mr. Smith's identification and that she had not had an opportunity to respond. CCR at 1193. The Circuit Court instructed the Commonwealth to coordinate "with Mr. Connell at this point to schedule that if that's something he wishes to proceed with," because it had just been filed one business day before. CCR AT 1193. An order entered after the hearing indicates that the *pro se* "Motion to Suppress the identification of Defendant by Cleion Smith" was withdrawn by counsel. CCR at 336.

In his suppression motion, Booth argued that "Detective Murphy obtained a booking photograph (Defendant in a striped jail suit) of Defendant and Smith identified him as the person who shot him (Smith was still induced by drugs and alcohol)." CCR at 312. Both in his suppression motion and again here, Booth contends that "Det. Murphy did not conduct a six-pack array photo lineup/double procedure (photo admonishment) of Mr. Smith's level of certainty." (ECF No. 1-1, at 12 (citation omitted).) However, counsel cannot be faulted for withdrawing Booth's motion to suppress and refusing to advance Booth's arguments.

"[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). "[E]ach case must be considered on its own facts," *id.*, and is "evaluated in light of the totality of surrounding circumstances." *See id.* at 383 (citations omitted). The circumstances here establish that the identification procedure was clearly not impermissibly suggestive, and counsel wisely withdrew Smith's baseless motion.

Mr. Smith unequivocally and consistently identified Booth as the shooter. Mr. Smith testified that he and Booth were close friends and had known each other for over thirty years,

which Booth does not dispute.  CCR at 1557, 1666.  Mr. Smith repeatedly identified Booth as the shooter to police before officers even showed Mr. Smith a photograph of Booth.  *See* CCR at 1604, 1607, 1614, 1618, 1644, 1666.  During trial, counsel asked an officer whether they showed Mr. Smith a photograph of Booth when they were in the apartment, and they agreed that they had not.  CCR at 1614.  The officers agreed that all they had was a name and no description.  CCR at 1614.  However, Detective Benshoff later testified that in the hospital, after Mr. Smith unequivocally told him that Booth shot him, he showed him a photograph of Booth to simply to ensure they "were talking about the same person," and Mr. Smith confirmed that was Booth.  CCR at 1644–45.  Thus, showing Mr. Smith a picture of Booth, after he had already identified Booth by name, was clearly not overly suggestive.  Counsel reasonably determined that the arguments in Booth's suppression motion were not a viable way to challenge Mr. Smith's identification of Booth.  Moreover, Booth fails to show any resulting prejudice from counsel's decision to withdraw the suppression motion.  *See Moody v. Polk*, 408 F.3d 141, 151 (4th Cir. 2005) ("Counsel is not required to engage in the filing of futile motions." (quoting *Murray v. Maggio*, 736 F.2d 279, 283 (5th Cir. 1984))).

### 3.  New Allegations Not Related to the Suppression Motion

Booth's allegations in Claim Three have expanded from the arguments in his *pro se* motion to suppress Mr. Smith's identification and now also fault counsel for not moving to suppress Mr. Carter's in-court identification of Booth.  With respect to Mr. Carter's identification of Booth in the courtroom, Booth again fails to demonstrate how this was overly suggestive or how counsel could have moved to suppress an in-court identification of Booth during trial.[11]  The evidence demonstrated that Mr. Carter, Mr. Smith, and Booth had been in Mr.

---

[11] Prior to trial, Mr. Carter had not said he knew who shot the victim.  Circuit Court Record 1465.

Carter's apartment the evening of the shooting.  Mr. Carter testified that "Cleon's friend" came

over and he agreed that he had met Booth before "through Cleon," and when asked, "do you see

that person in the courtroom here today," he identified Booth.  CCR at 1365–66.  Counsel

reasonably eschewed advancing Booth's lengthy argument about overly suggestive lineups.

Instead, after Mr. Carter identified Booth as the person at his apartment that evening, and as the

shooter, counsel questioned Mr. Carter about his inconsistent prior statements.

Clearly, Mr. Carter was not the most reliable witness and counsel highlighted that fact to

the jury.  Both Mr. Carter and Mr. Smith testified that Mr. Carter was not in the room when

Booth shot Mr. Smith.  CCR at 1367, 1574.  Mr. Carter indicated that when Booth pulled his

firearm he ran to his bedroom, locked the door, and hid until "[a]fter the noise slowed down and

[it] got quiet."  CCR at 1367.  Counsel played the recording of the 911 call Mr. Carter made and

questioned him about why he did not tell the dispatcher he knew who shot Mr. Smith.  CCR at

1372–75.  Mr. Carter admitted that he did not tell the dispatcher or police later in the morning

that it was Booth who shot Mr. Smith, but blamed this on being drunk.  CCR at 1373–77.  When

Mr. Carter testified that he told officers that Booth was "over [at the apartment] earlier," counsel

introduced Mr. Carter's recorded statement to police where he did not mention Booth by name.

CCR at 1376–77.  Mr. Carter explained that he did not know Booth's name at the time so he

could not provide it, but that he recognized Booth at the time of the trial.  CCR at 1376–77.  Mr.

Carter also admitted that he did not tell the police that he had "seen Mr. Booth before" and

"recognized him."  CCR at 1378.  Mr. Carter agreed that he did not tell the 911 dispatcher, the

police who interviewed him, or the officers at the scene that Booth had shot Mr. Smith.  CCR at

1382.  Mr. Carter also denied making several of the recorded statements about who opened the

door to let the shooter in and claimed that he did not remember providing police with a general

description of the shooter.  CCR at 1379–83.  When counsel attempted to read the recorded statement to Mr. Carter to ask him about inconsistencies, Mr. Carter stated:  "You can read all you want.  I tell you I was intoxicated."  CCR at 1383.  On redirect, Mr. Carter indicated that he was really drunk, scared, did not trust the police, and did not "know what [he] was saying." CCR at 1384–85.

Although the Circuit Court would not permit counsel to play the body camera footage during Mr. Carter's testimony, CCR at 1385–89, the jury later saw the exact footage where Mr. Carter indicated to police three times that he did not know who shot Booth.  CCR at 1548–51. Officer Rugio, Detective Benshoff, and Office Elder testified that Mr. Carter never said anything about the shooter being Booth, and in response to counsel's questions, testified that Mr. Carter repeatedly indicated he did not know or did not see who shot Mr. Smith.  CCR at 1461–62, 1548, 1551, 1552–55, 1609.[12]  On cross-examination, Detective Benshoff agreed that the first time Mr. Carter ever indicated that Booth was the person who shot Mr. Smith was during trial.  CCR at 1465.

In his closing arguments, counsel argued to the jury that Mr. Smith and Mr. Carter's identifications of Booth were unreliable.  CCR at 1702–06, 1709, 1712.  Even with counsel highlighting the inconsistencies in Mr. Carter's identification of the shooter, the jury nevertheless credited Mr. Carter's testimony that Booth was the person who shot Mr. Smith.  Booth fails to identify any plausible strategy that counsel omitted pertaining to Mr. Carter's in-court

---

[12] Booth takes issue with Mr. Carter's description of the shooter to police arguing that the weight and height he provided were incorrect.  (ECF No. 1-1, at 17.)  Counsel questioned Detective Benshoff about Mr. Carter's vague description in the recorded statement that the shooter was about the same height and build as Detective Benshoff.  CCR at 1462–64.  At trial, Booth and Detective Benshoff stood next to one another, and they were the same height, but different builds.  CCR at 1462–64.

identification of him as the shooter.  Again, Booth fails to demonstrate any deficiency of counsel

or resulting prejudice.  Accordingly, Claim Three lacks merit and will be DISMISSED.[13]

## IV.    Request for Evidentiary Hearing

Booth also filed a Request for an Evidentiary Hearing.  (ECF No. 18.)  In determining

whether a case warrants an evidentiary hearing, a federal court must consider whether the

evidentiary hearing would provide the petitioner the opportunity to "prove the petition's factual

allegations, which, if true, would entitle the applicant to federal habeas relief."  *Schriro v.*

*Landrigan*, 550 U.S. 465, 474 (2007); *see Mayes v. Gibson*, 210 F.3d 1284, 1287 (10th Cir.

2000).  A federal court must also consider the standards set forth in 28 U.S.C. § 2254 when

considering whether an evidentiary hearing is appropriate.  *Schriro*, 550 U.S. at 474.  "It follows

that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a

district court is not required to hold an evidentiary hearing."  *Id.*

---

[13] Booth vaguely concludes that "[t]he litany of errors by Mr. Connell warrants this Court to consider the 'total effects' of counsel's errors when making an ineffective assistance claim." (ECF No. 1-1, at 20.)  The cumulative analysis that Booth advances is not permitted here, because the Court has rejected Booth's assertion that counsel performed deficiently.  *Fisher v. Angelone*, 163 F.3d 835, 852–53 (4th Cir. 1998).  Attorney "acts or omissions 'that are not unconstitutional individually cannot be added together to create a constitutional violation.'"  *Id.* (quoting *Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996)).

Because Booth is aware that he procedurally defaulted his claims, he argues that he has shown that a miscarriage of justice has occurred because he is actually innocent.  (ECF No. 1-1, at 21–26.)  Although the Court need not conduct an actual innocence inquiry here because the Court reviewed the merits of Booth's claims despite his default, the Court briefly notes that Booth has not shown that he is actually innocent.  First, the Court of Appeals of Virginia found that no miscarriage of justice had occurred, and the record contained no evidence of Booth's innocence, and this Court agrees.  (ECF No. 14-6, at 1–5.)  Here, Booth reiterates all of the facts and arguments underlying his ineffective assistance claims to argue that he is actually innocent.  As discussed in conjunction with Claims One through Three, none of the text messages he wanted introduced, the fact that Mr. Smith and Mr. Carter were intoxicated, or the fact that he believes that Mr. Smith's and Mr. Carter's identifications were unreliable, demonstrate that Booth was actually innocent of shooting Mr. Smith.

Here, based on a thorough evaluation of Booth's claims and the record before the Court, the Court concludes that Booth's claims of ineffective assistance of counsel lack merit. Therefore, the Court concludes that habeas relief under § 2254 is not warranted. The Request for an Evidentiary Hearing (ECF No. 18) will be DENIED.

## VI.   Conclusion

For the foregoing reasons, Respondent's Motion to Dismiss (ECF No. 12) will be GRANTED. Booth's claims will be DISMISSED and his § 2254 Petition will be DENIED. The Request for an Evidentiary Hearing (ECF No. 18) and Motion for Obtaining Bail Pending Habeas Corpus (ECF No. 19) will be DENIED. The action will be DISMISSED. A certificate of appealability will be DENIED.[14]

An appropriate Final Order shall issue.

Date:   8/21/23
Richmond, Virginia

/s/
M. Hannah Lauck
United States District Judge

---

[14] An appeal may not be taken from the final order in a § 2254 proceeding unless a judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A). A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Booth fails to meet this standard.